IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACEY FERRY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:13-cv-02031 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | Hon. John E. Jones III |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

April 23, 2014

### Introduction

Plaintiff Stacey Ferry has filed this action seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Ferry's claim for

social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes. The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  Ferry met the insured

status requirements of the Social Security Act through December 31, 2014.  Tr. 125.[1]

Ferry protectively filed[2] her application for disability insurance benefits on March 22, 2010. Tr. 29.  Ferry claims that she became disabled on April 14, 2009.  Id.  Ferry has been diagnosed with several impairments, including demyelinating disease, right shoulder degenerative joint disease, degenerative joint disease of the bilateral knees, degenerative disc disease of the cervical spine, and obesity.  Tr. 16-17.  On July 7, 2010, Ferry's application was initially denied by the Bureau of Disability Determination. Tr. 85.

On September 4, 2010, Ferry requested a hearing before an administrative law judge ("ALJ").  Tr. 90.  The ALJ conducted a hearing on February 23, 2012, where Ferry was represented by counsel.  Tr. 27-81.   On February 29, 2012, the ALJ issued a decision denying Ferry's application.  Tr. 14-22.  On May 24, 2013, the Appeals Council declined to grant review.  Tr. 1.  Ferry filed a complaint before this Court on July 29, 2013.   Supporting and opposing briefs were submitted and this case became ripe for disposition on March 19, 2014, when Ferry declined to file a reply brief.

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

[2] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

Ferry appeals the ALJ's determination on three grounds: (1) the ALJ erred in failing to explain whether the residual functional capacity assessment accounted for Ferry's limitations "during an exacerbation of [her] demyelinating disease[3] or during remission," (2) the ALJ erred in failing to give appropriate weight to the medical opinion of Ferry's treating physicians, and (3) the ALJ erred in failing to find Ferry credible.  For the reasons set forth below, the decision of the Commissioner is affirmed.

**Statement of Relevant Facts**

Ferry is 39 years of age, obtained her GED, and is able to read, write, speak and understand the English language. Tr.  38-39.  Ferry also received two and a half years of advanced education in business and criminal justice; she did not obtain a degree from these studies.  Tr. 38.

Ferry's past relevant work included work as a store laborer, classified as medium, unskilled work, as a fast food worker, classified as light, unskilled work, and as an industrial truck operator, classified as light, unskilled work.  Tr. 230. Finally, Ferry performed work as a charge account clerk, which is classified as sedentary, unskilled work. Tr. 67.

---

[3] Demyelinating disease is "any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in your brain and spinal cord. When the myelin sheath is damaged, nerve impulses slow or even stop, causing neurological problems." Mayoclinic.com, Demyelinating disease: What causes it?, *available at* http://www.mayoclinic.org/demyelinating-disease/expert-answers/FAQ-20058521 (last visited April 22, 2014)

A.      **Ferry's Demyelinating Disease**

On March 26, 2006, Henry Ching, MD performed a magnetic resonance imaging ("MRI") scan on Ferry.  Tr. 511.  This MRI revealed that Ferry's brain was "essentially normal in appearance."  Id.  However, the MRI revealed a few small foci of increased signal in the peripheral white matter in the left and right frontal lobes along the anterior superior aspect of the frontal lobes.  Id.  Dr. Ching noted that these foci were "punctate in size."  Id.

By 2009, Ferry began having headaches and visual problems.  Tr. 401. Mary Varkey, MD, Ferry's treating physician, ordered a computerized tomography ("CT") scan of Ferry's head; this CT scan was performed on July 9, 2009.  Id. This test revealed no abnormalities.  Id.  Dr. Varkey ordered a second CT scan, performed on September 22, 2009.  Tr. 373.  This CT scan was also normal, and showed no change from the previous CT scan.  Id.

On September 27, 2009, a second MRI was performed on Ferry's brain.  Tr. 265.  This MRI showed multiple hyperintense foci in the subcortical and periventricular white matter of Ferry's brain.  Id.  The radiologist who performed the MRI, George Galanis, MD, noted that these foci were "minimally more prominent in appearance" than they had been in Ferry's 2006 MRI.  Id.  Dr. Galanis noted the findings indicated potential demyelinating disease.  Id.

This abnormal MRI scan finding resulted in Dr. Varkey recommending Ferry to a neurological specialist, Mehrullah Khan, MD.  Tr. 498.  On October 15, 2009, Dr. Khan noted that the 2009 MRI showed a worsening of the high signal intensity areas of Ferry's brain as compared to the 2006 MRI; this raised concern with Dr. Khan about possible demyelinating disease.  Id.  Dr. Khan ordered additional testing which later ruled out both Lyme disease and lupus, although the tests left Dr. Khan unable to confirm a diagnosis of multiple sclerosis ("MS").  Tr. 496.  Dr. Khan noted that the only abnormal finding on the MRI scan was "some high signal intensity areas, nonspecific."  Id.

On February 4, 2010, at the recommendation of Dr. Khan, Ferry was examined by Max Lowden, MD, a doctor at the Neurology Clinic at Hershey Medical Center.  Tr. 358.  Dr. Lowden did not have access to Ferry's MRI scans at that time.  Tr. 359.  Nonetheless, after reviewing the reports associated with the MRI scans, Dr. Lowden noted that the evidence supported a diagnosis of demyelinating disease.  Tr. 360.  Dr. Lowden concluded that that Ferry possibly suffered from demyelinating disease, an autoimmune disorder, or an inflammatory disorder.  Id.

At the order of Dr. Kahn, a third MRI scan was performed on Ferry's brain on February 27, 2010.  Tr. 502.  The MRI scans again showed signs of mild cerebral white matter disease.  Id.  The radiologist who conducted the MRI, Dr.

Ching, noted that the scan was similar to the 2009 MRI, although "actually somewhat better," likely due to technical reasons.  Id.

After examining the 2010 MRI scan, Dr. Khan concluded that the "high signal intensity areas [were] unchanged from the [previous] year."  Tr. 495.  In this report, Dr. Khan concluded that the results were still indicative of demyelinating disease, although he could not diagnose Ferry with MS.  Id.  Dr. Khan emphasized that he could not confirm demyelinating disease, and urged Ferry to return to Dr. Lowden for a second opinion.  Id.

On April 8, 2010, Dr. Lowden conducted a follow-up examination of Ferry. Tr. 355.  Dr. Lowden repeated that Ferry's MRI scans indicated possible diseases such as demyelinating disease, autoimmune disorder, or inflammatory disorder. Tr. 356.

In August of 2010, Ferry twice went to the emergency room complaining of pain, numbness, tingling, and spasms.  Tr. 559, 586.  Based on Ferry's records, both emergency room physicians, David Marx, MD, and Mark Binkley, MD, noted a past history of demyelinating disease.  Id.

On February 25, 2011, Dr. Khan ordered a fourth MRI scan of Ferry's brain. Tr. 596.  This scan also found multiple small foci of increased signal in the periventricular and peripheral cerebral white matter of Ferry's brain.  Id.  However, the scan showed no change from the 2010 MRI scan.  Id.

Prior to the fourth MRI scan, on June 30, 2010 Michael Brown, D.O. completed a physical residual functional capacity assessment of Ferry.  Tr. 534. Dr. Brown opined that Ferry was able to occasionally lift up to twenty pounds, and could frequently lift up to ten pounds.  Tr. 535.  Dr. Brown stated that Ferry could stand and/or walk for up to six hours in an eight hour workday, and was also able to sit for six hours during an eight hour workday.  Id.  Dr. Brown opined that Ferry's ability to push and pull were not limited.  Id.

Dr. Brown believed that Ferry was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  Tr. 536.  Dr. Brown also believed Ferry was limited in her ability to reach in all directions.  Id.  However, Dr. Brown opined that Ferry had no limitations in her handling, fingering, and feeling abilities.  Id.  Dr. Brown also believed that Ferry had no visual, communicative, or environmental limitations.  Tr. 536-37.

Dr. Brown noted that Ferry's medical records established degenerative diseases in her right shoulder and cervical spine, but found that any demyelinating disease was minor and nonspecific.  Tr. 539.  Dr. Brown noted that both neurological specialists that had examined Ferry could not diagnose her with MS. Id.  Dr. Brown further noted that other causes for the nonspecific findings, other than MS, had been ruled out.  Id.  Dr. Brown considered Ferry's treatment history, subjective complaints, and activities of daily living in assessing her credibility, and

found that Ferry's statements regarding symptoms were only partially credible.  Tr. 539-40.

### B.     The Administrative Hearing

On February 23, 2012, Ferry's administrative hearing was conducted.  Tr. 27-81.  At that hearing, testimony was elicited from Ferry.  Tr. 32-79.  Ferry testified to, among other things, symptoms of shaking, sleepiness, fatigue, generalized weakness, loss of memory, and pain in her hands and feet.  Tr. 55-64.  Ferry also testified that she sometimes needed to lie down or sleep two to three times a day and that heat and sun increased her symptoms.  Id.  Ferry stated she could walk up to a mile before becoming fatigued.  Tr. 61.

After Ferry testified, Michael Kibler, an impartial vocational expert, was called to give testimony.  Tr. 64.  The ALJ asked the vocational expert to assume that Ferry was limited to light work[4] and required "normal breaks."  Tr. 67.  Furthermore, the ALJ asked the vocational expert to assume that Ferry could only occasionally climb stairs, could never climb ropes, ladders, scaffolding, or poles, could only occasionally stoop, kneel, crouch, or squat, and could never crawl.  Tr.

---

[4] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

67-68.  The ALJ also limited Ferry in this hypothetical to only occasionally reaching overhead with her right upper extremity, and only occasional exposure to extreme humidity, cold, heat, or exposure to fumes, dusts, gases, and poor ventilation.  Tr. 68.  The ALJ further stated that Ferry must avoid loud or very loud noise levels.  Id.  Finally, the ALJ added that in this scenario, Ferry could not work in high, exposed places, or around fast-moving machinery on the ground.  Id.

The vocational expert opined that, given these hypothetical restrictions, Ferry would still be able to perform her past relevant work as either a fast food worker or as a charge account clerk.  Tr. 70.  The vocational expert also stated that if Ferry were limited to sedentary work, she would still be able to return to work as a charge account clerk.  Id.

The ALJ then asked the vocational expert if, under the first hypothetical scenario, there would be any other jobs that exist in significant numbers in the national economy that the individual would be able to perform.  Tr. 72-73.  The vocational expert testified that this individual would be capable of performing four other jobs that exist in significant numbers in the national economy, albeit with a 30% erosion to the skill base: an egg candler, a cashier II, an usher, and a conveyor line bakery worker.  Tr. 73-75.  Under the second scenario with sedentary work restrictions, the vocational expert testified that the hypothetical individual would

be able to work as a call-out operator, a pari-mutuel checker, or a table worker.  Tr. 75-77.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into

account whatever in the record fairly detracts from its weight." Universal Camera

Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not

substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058,

1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain

evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the

record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability

insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the

Commissioner to consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity, (2) has an impairment that is severe or a combination

of impairments that is severe, (3) has an impairment or combination of

impairments that meets or equals the requirements of a listed impairment, (4) has

the residual functional capacity to return to his or her past work and (5) if not,

whether he or she can perform other work in the national economy. See 20 C.F.R.

§ 404.1520.  The initial burden to prove disability and inability to engage in past

relevant work rests on the claimant; if the claimant meets this burden, the burden

then shifts to the Commissioner to show that a job or jobs exist in the national

economy that a person with the claimant's abilities, age, education, and work

experience can perform.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

### A.     Step One

The ALJ at step one of the sequential evaluation process found that Ferry

had not engaged in substantial gainful work activity since April 14, 2009, the

alleged onset date. Tr. 16.  As a result, Ferry alleges no error here.

### B.     Step Two

At step two of the sequential evaluation process, the ALJ found that Ferry

suffered from three severe impairments: right shoulder degenerative join disease,

degenerative joint disease of bilateral the knees, and demyelinating disease.  Tr.

16.  The ALJ further determined that Ferry suffered from two non-severe

impairments: degenerative disc disease of the cervical spine and obesity.  Tr. 17.

The ALJ also concluded that MS, Lyme disease, and fibromyalgia were not

medically determinable impairments.  Tr. 16-17.  Ferry likewise does not allege

error as to this finding.

### C.     Step Three

At step three, the ALJ concluded that Ferry did not suffer from an

impairment or combination of impairments that met or medically equaled the

severity of a listed impairment.  Tr. 17-18.  Once again, Ferry does not allege error as to this finding.

### D.    Step Four

At step four of sequential evaluation process, the ALJ found that Ferry maintained the Residual Functional Capacity to perform light work.  Tr. 18.  The ALJ found that Ferry was limited in performing light work inasmuch as she was not able to work in high, exposed places or around fast moving machinery.  Id. The ALJ further found that Ferry was must be able to take breaks throughout the work day, including a 10 to 15 minute break in the morning, a 30 minute lunch break, a 10 to 15 minute afternoon break, and two 5 to 10 minute unscheduled breaks.  Id.  Ferry was further restricted to only occasionally reaching overhead with the right upper extremity, and could not be required to crawl or climb ropes, ladders, scaffolding, or poles.  Id.  Additionally, the ALJ found that Ferry could only occasionally stoop, kneel, crouch, and climb stairs, and could have no more than occasional exposure to extreme cold, heat, or humidity.  Id.  The ALJ also stated that Ferry was restricted to only occasional exposure to concentrated fumes, dust, gases, and poor ventilation; she also could not be exposed to loud or very loud noise intensity levels.  Id.

At step four, the ALJ posed a hypothetical question to the vocational expert that accurately depicted all of these limitations.  Tr. 94-95.  Based on this

hypothetical question, the vocational expert testified that such a hypothetical

individual would be able to return to Ferry's previous work.  Tr. 95.  Ferry

challenges the residual functional capacity on three grounds.

> i.      The ALJ's Assessment of Ferry's Demyelinating Disease

Ferry first contends that the ALJ erred in failing to explain whether the

residual functional capacity assessment accounted for Ferry's limitations during an

exacerbation of her demyelinating disease or during remission.

Ferry asserts that "the most common type of demyelinating disease is the

relapsing, remitting type that occurs in cycles of remission and relapse."  While

this may be true, there is no medical evidence to support Ferry's assertion that her

specific demyelinating disease waxed and waned.  Ferry herself did testify that her

condition worsened during the summer.  Tr. 59.  However, no doctor ever offered

evidence or an opinion that Ferry's condition cycled through remission and

relapse.

To the extent that Ferry's condition may deteriorate at times and improve at

others, the ALJ's opinion adequately accounted for the worst of Ferry's credible

symptoms.  In determining a residual functional capacity, the ALJ noted that Ferry

suffered from chronic fatigue and pain.  Tr. 20.  To account for these symptoms,

the ALJ required regular breaks, both scheduled and unscheduled, and limited

Ferry's exposure to heat, cold, humidity, fumes, gas, dust, and poor ventilation.  Id.

The ALJ also limited Ferry's exposure to noise, height, and machinery.  Id. As

discussed infra, the ALJ accounted for all symptoms and limitations that were

supported by medical evidence, and found Ferry's testimony regarding her

symptoms to be less than credible.

As there is no medical evidence supporting Ferry's assertion that her

demyelinating disease waxed and waned, and the ALJ accounted for Ferry's

credible symptoms.  Consequently, the ALJ did not err in failing to specifically

state whether the residual functional capacity assessment accounted for Ferry's

demyelinating disease during an exacerbation of the disease or a remission of the

disease.

ii.    Treating Physician Opinion

Ferry asserts that the ALJ erred in failing to give "significant or controlling

weight . . . to [Ferry's] treating physicians' opinion that [she] did have

demyelinating disease."  To the contrary, as previously noted, the ALJ found at

step two that Ferry's demyelinating disease was both medically determinable and

severe. Tr. 16.  Regardless of what weight was given to the opinion of Ferry's

treating physicians, the ALJ agreed with those opinions.  Consequently, no error

was committed with respect to the opinion of Ferry's treating physician.

### iii.   Ferry's Credibility

Ferry further contends that the ALJ committed reversible error in discounting Ferry's statements regarding her symptoms of demyelinating disease, such as pain, fatigue, drowsiness, and short attention spans.

"Allegations of pain and other subjective symptoms must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999), citing 20 C.F.R. § 404.1529.  Where an ALJ does make findings of credibility, those findings are accorded great weight and deference by a reviewing court. See, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ found that Ferry's medically determinable impairments could be expected to cause her symptoms, but that Ferry's allegations of intensity, pain, and limiting effects were not credible. Tr. 19.  The ALJ noted that Ferry's MRIs had revealed only mild, non-specific white matter disease.  Id.  The ALJ further noted Ferry's neurological exam remained "essentially unchanged, with normal gait and no other deficits."  Id.  The ALJ also found it significant that Ferry did not require narcotic treatment for her complaints of diffuse pain.  Id.  The ALJ also gave significant weight to Dr. Brown's opinion, wherein Dr. Brown opined that Ferry had very few functional limitations.  Tr. 19-20.

Finally, the ALJ found that there was inconsistent evidence in the record, medical reports, and in testimony provided by Ferry at her administrative hearing.

Tr. 20.  The ALJ noted that Ferry's daily activities, including preparing meals, cleaning her house, doing laundry, washing dishes, walking her dogs, paying bills, shopping for food and household items, and walking up to one mile before stopping were inconsistent with her alleged symptoms.  Id.  The ALJ stated that, while none of the evidence was alone conclusive, taken in the aggregate, the evidence was "suggestive of an individual capable of performing work activity on a sustained basis with the above residual functional capacity."  Id.

Additionally, only one doctor in the administrative record, Michael Brown, D.O., the state agency consulting physician, provided any medical opinion as to the functional limitations imposed on Ferry by her medically determinable diseases. Tr. 534-40.  Dr. Brown opined that Ferry was capable of performing light work, with mild limitations in her ability to climb, balance, stoop, kneel, crouch, crawl, and reach in all directions.  Id.  The ALJ largely adopted Dr. Brown's assessment, but did add additional limitations to Ferry's functional abilities, including numerous environmental restrictions.  Tr. 18.

The ALJ made a finding of credibility based on substantial evidence, and reached a residual functional capacity based largely on the only medical opinion available in this case.[5]  This finding is entitled to great weight, particularly where

---

[5]  Since the residual functional capacity assessment proposed by the ALJ included limitations in excess of those that Dr. Brown felt existed, it is readily apparent that the ALJ did give at least some benefit of the doubt to Ferry in assessing her pain and limitations.

there is no medical opinion or objective medical evidence contradicting such a finding.  See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be.").  Consequently, substantial evidence supported the ALJ's finding that Ferry's allegations of symptoms and limitations were not entirely credible.

As a whole, the ALJ's residual functional capacity determination was supported by substantial evidence.  Furthermore, an impartial vocational expert testified that Ferry would be able to perform at least some of her past relevant work with this residual functional capacity.  Tr.  70.  Consequently, the ALJ's determination at step four is supported by substantial evidence.

### E.    Step Five

At step five, the ALJ concluded in the alternative that even if Ferry were unable to return to her past relevant work, she was capable of performing three jobs that exist in significant numbers in the national economy.  Tr. 22.  In making this determination, the ALJ posed a hypothetical question that accurately reflected Ferry's residual functional capacity to a vocational expert.  Tr. 67-68.  The vocational expert testified that, under the circumstances presented in the hypothetical question, the individual would be able to perform three jobs that exist

in significant numbers in the national economy.  Tr. 73-75.  As the hypothetical

question posed accurately reflected Ferry's residual functional capacity, the ALJ's

determination that Ferry could perform jobs that exist in a significant number in

the national economy is supported by substantial evidence.

## **Conclusion**

A review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. §

405(g), the decision of the Commissioner is affirmed.

An appropriate Order will be entered.